## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**REDA TALEB,**

     **Plaintiff,**

                            **Case No. 22-11692**

**v.**

                            **Hon. Denise Page Hood**

**ISABELLA CASILLAS GUZMAN,**

     **Defendant.**

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#15)

## I.     BACKGROUND

On July 22, 2022, Plaintiff Reda Taleb filed the instant suit against Defendant Isabella C. Guzman, Administrator of the U.S. Small Business Administration ("SBA") alleging: Discrimination Based on National Origin, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* (Count I); Discrimination Based on Religion, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* (Count II); and, Retaliation, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* (Count III).

The SBA was granted additional funds to assist small businesses under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act during the

pandemic, including funding for expedited hiring of two temporary employees per district office.  (Scott Dep., ECF No. 15, PageID.108)  Constance Logan, the District Director of the Michigan District Office, hired Taleb as an outreach and marketing specialist in April 2020.  (Taleb, Dep., ECF No. 17, PageID.394) Logan also hired Taleb's friend, Shams Al-Badry, to fill the other temporary position. (Al-Badry Dep., ECF No. 15, PageID.154-.155)  Taleb is Muslim, but does not wear a hijab.  Al-Badry is also a Muslim and wears a hijab.  The SBA employees worked remotely and interacted with each other through email, phone, and video conference.  (Taleb Dep., ECF No. 17, PageID.394)

Taleb claims that shortly after starting at the SBA, her colleagues, Brian Picarazzi, and Catherine Gase, ignored her in meetings and failed to introduce her on conference calls. (*Id*. at PageID.458, .471-.472, .482-.483) Picarazzi, between April 2020 and October 2020, was a senior area manager and had been with the SBA since 2009.  (Picarazzi EEO Inv., ECF No. 15, PageID.171) Gase, during the same time, was a lead economic development specialist and had been with the SBA since 1987.  (Gase EEO Inv., ECF No. 15, PageID.194-.195)  Taleb also claims that Gase tried to pass duties to her but did not include her in meetings. (Taleb Dep., ECF No. 17, PageID.458)  Taleb asserts that she complained of their conduct to Logan "frequently." *(Id*. at PageID.530-.533)  Logan viewed Taleb's

complaints as typical workplace issues and addressed them as such. (Logan Dep., ECF No. 15, PageID.147)

When Taleb first started at the SBA, she was supervised by the Deputy District Director, Laketa Henderson. (Taleb Dep., ECF No. 17, PageID.398-.399) Henderson struggled with Taleb because she was not responsive to Henderson. (Emails, ECF No. 15, PageID.229-.232) When Henderson was detailed to another office, Logan took over as Taleb's direct supervisor. (Taleb Dep., ECF No. 17, PageID.398)   Andrea Roebker was the regional communications director for Region 5, which included Michigan. (Roebker EEO Inv., ECF No. 15, PageID.213-.214)  She worked closely with Taleb and was concerned that Taleb could not handle her assigned duties and that she was unprofessional in her communications. (Taleb Dep., ECF No. 17, PageID.426-.427; Scott Dep., ECF No. 15, PageID.109)  Roebker told the Regional Administrator, Robert Scott, who was Logan's boss, about her concerns.  (Scott Dep., ECF No. 15, PageID.109)

In August 2020, Logan thought Taleb was doing great and sought to hire her in a permanent position, but Scott told Logan that he had received negative feedback about Taleb and was not sure he would approve hiring her for a permanent role. (Email, ECF No. 15, PageID.234-.235). Logan created a development plan to help Taleb. *Id.*

Taleb told Logan that she was harassed and discriminated against because of her national origin and religion.  She indicated that  Gase and Picarazzi treated her differently than non-Arab and non-Muslim co-workers.  (Taleb Dep., ECF No. 17, PageID.530-.534, .540) Taleb told Logan she was "concern[ed] that this could be discrimination and that I felt that I was being harassed." (*Id*. at PageID.535) Taleb claims that every time she brought this to Logan's attention, Logan admonished her not to tell anybody else. (*Id*. at PageID.531-.532, .541, .892)  "[A]lmost from the time that I began to complain, her … statements to me were always, 'Don't say anything to anyone. I'll handle it.'" (*Id*. at PageID.482) Taleb felt that Logan did not handle it and did nothing to stop the harassment.  (*Id*. at PageID.478)

Taleb was involved in planning and executing an SBA trip – the "Road Show" – for Scott and Logan to meet with Michigan businesses and press to publicize the SBA's programs and accomplishments. (*Id*., PageID.438-.439; Scott Dep., ECF No. 15, PageID.107) Over the four weeks of planning, Taleb claims Gase withheld trip plans from her and that she and Al-Badry were excluded from meetings, phone calls, emails, and trip planning. (ECF No. 17, PageID.457-.461, .892-.894) Taleb further claims that when Gase included Taleb and Al-Badry in the meetings, she "ignored us on the call, didn't announce our job duties or what role we were playing. She didn't allow us to speak." (*Id.*, PageID.503-.504) She asserts

that Gase prevented Taleb from obtaining information she needed to communicate with media, business owners, and congressional aides and staffers. (*Id*., PageID.504-.505, .526, .911)  Taleb believed that Picarazzi was also withholding information from her.  She claims that but for three weeks, Picarazzi ignored her requests for media information, even though it was her duty to field media requests for his territory.  (*Id*., PageID.403)  Picarazzi ignored Taleb and did not introduce her to people in his territory. (*Id*., PageID.490-.491, .494)

At a Grand Rapids pizzeria visit during the Road Show, a reporter reiterated the media requests to Picarazzi which Taleb claimed he refused to provide such information to her when she had asked for previously.  Taleb claims Picarazzi disrespected her in front of the reporter by "flicking his hand … in front of my face and saying, 'Oh, Reda will give it to you'". (*Id*., PageID.492, .512) Taleb, who was seated at the time, felt unsafe because Picarazzi, who was taller, towered over her. (*Id*.) After the reporter left, Taleb told Picarazzi outside the pizzeria, "Hey, Brian, don't ever disrespect me like that in front of anybody, especially an outside agency partner."  Picarazzi said "huh" and walked away.  (*Id*., PageID.511)

Scott was also disrespectful to Taleb that same day.  When Taleb was speaking to Logan, Scott "screamed" at Taleb "at the top of his lungs" "Reda, stop it now." (*Id*., PageId.509)

While on the Road Show on September 2-4, 2020, Taleb claims she had to fix substantial problems caused by Gase. (*Id*., PageID.892-.894) After the Road Show, Scott emailed Logan claims allegedly from Congressional aides about Taleb. (Email, ECF No. 17, PageID.915-.916) Neither Scott nor Logan ever asked Taleb what had happened or conducted any type of inquiry to determine if the allegations were true or accurate. (Taleb Dep., ECF No. 17, PageID.551; Logan Dep., ECF No. 15, PageID.143)

Taleb emailed Logan about Picarazzi's "unprofessionalism" and "disrespecting" Taleb on the Road Show and his negative impact on her ability to do her job. Logan told Taleb that her "tone" was "unprofessional." Taleb emailed back explaining her email and state of mind, concluding that she "truly look[ed] forward to addressing and resolving the issues" she had brought to Logan's attention on many previous occasions. (Email, ECF No. 17, PageID.918-.920) Taleb claims Logan took no action.

On September 24, 2020, a Road Show debrief was held to "examine the trip as a whole, to offer feedback, and to share our experiences, what … processes and protocols and things worked well, and … what went wrong." (Taleb Dep., ECF No. 17, PageID.526-.527) Al-Badry commented regarding the lack of preparation and follow up, which Logan called "great points." (Debrief Tr., ECF No. 17,

PageID.928-.929)   Taleb agreed with Al-Badry and tried to discuss the role of project lead. (*Id.*, PageID.930) However, Logan shut her down. After some back and forth, Logan asked Taleb to leave the call. (*Id.*, PageID.931-.932) Taleb claims she had not named or criticized any team member during the debriefing.

Taleb thereafter emailed Logan stating, "you are targeting me for my viewpoints, as well as treating me unprofessionally" and that she had a right to work in a "nonhostile work environment". (Email, ECF No. 17, PageID.939-.940) Logan emailed back that Taleb had been unprofessional because she had "targeted … Cathy [Gase]". (Email, ECF No. 17, PageID.942) Logan indicated that she told Taleb that her "unprofessional behavior will not be tolerated," i.e., she "will not accept it". (*Id.*; Logan Dep., ECF No. 17, PageID.658) Taleb claims that Logan made no inquiry or investigation regarding Taleb's complaints of hostility and targeting. (Logan Dep., ECF No. 17, PageID.658-660)

The next day, Friday, September 25, 2020, Taleb and Logan met by telephone for their normal weekly meeting. (Taleb Dep., ECF No. 17, PageID.540) They discussed the emails from the 24th and Taleb reiterated her complaints of harassment and hostile environment. Taleb included Logan in her complaints stating, "I hope you all are not treating me like this because I'm Arab and Muslim." (*Id.*, PageID.545-.546)  Logan asked Taleb "Is that how you really feel?"

7

and Taleb said "yes."   "And once [Taleb] said that, [Logan's] entire tone and her demeanor changed. She got very silent on the phone. And [Taleb] recall[ed] her taking a deep breath and then sternly and coldly saying to [Taleb], 'I'm going to … follow up with you with an e-mail.'" (*Id.*, PageID.539)

On Monday, September 28, 2020, Logan emailed Employee Relations Specialist Elizabeth Hicks about her "decision to terminate" Taleb.  (Emails, ECF No. 17, PageID.942-.946; .948; Hicks Dep., ECF No 17, PageID.1012-.1013)  This was the only time Logan contacted Human Resources about Taleb.  Logan did not tell Hicks that Taleb complained to Logan that others, including Logan, harassed her.  (Hicks Dep., ECF No. 17, PageID.976, .980-.981, 1032) Logan solicited a statement from Scott. (Scott Dep., ECF No. 15, PageID.112)

Logan informed Taleb of her termination by telephone on October 1. (Taleb Dep., ECF No. 17, PageID.547)  During that call, Logan repeatedly discussed Taleb's protected activity on September 24th and 25th; called Taleb's accusation that Logan was targeting her because she is a "Muslim woman" "mindblowing"; stated that she did not "deserve" Taleb's accusations; and complained that Taleb had "turn[ed] on" her.  (Tr., ECF No. 17, PageID.1080-.1083, .1096-.1100, .1102-.1103)

This matter is now before the Court on Guzman's Motion for Summary

Judgment.  A response and reply have been filed and a hearing held on the matter.

## II.   ANALYSIS

### A.   Standard of Review

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id*.  Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).   Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.   In such a situation, there can be

"no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

### B.   Hostile Work Environment Based on National Origin and Religion (Counts I and II)

Guzman seeks summary judgment on Taleb's hostile work environment claims based on national origin and religion. Taleb argues summary judgment should not be granted.

To survive summary judgment on a discriminatory hostile work environment claim, a plaintiff must show that: 1) she was a member of a protected class; 2) she was subjected to unwelcome discriminatory harassment; 3) the harassment was based on her national origin and/or religion; 4) "[t]he harassment had the effect of unreasonably interfering with [her] work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999).

A plaintiff may prove that harassment was based on a protected class by either 1) direct evidence of the use of derogatory terms specifically referencing the protected class or 2) comparative evidence about how the alleged harasser treated

members of both classes in a mixed-class workplace. *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). A hostile work environment occurs when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). The totality of the circumstances must be considered to determine, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. *See Williams v. General Motors Corp.,* 187 F.3d 553, 562 (1999). The issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether, taken together, the reported incidents make out such a case. *Id.* at 563. A verbal reprimand does not constitute an adverse action. *Weigold v. ABC Appliance, Co.,* 105 F. App'x 702, 708 (6th Cir. 2004). Subjective beliefs about mistreatment in employment are insufficient to survive summary judgment. *See Giles v. Norman Noble, Inc.,* 88 F. App'x 890, 894 (6th Cir. 2004); *Mitchell v. Toledo Hospital,* 964 F.3d 577, 585 (6th Cir. 1992).

Guzman argues that there is zero evidence that any treatment was based on Taleb's protected classes of her national origin and/or religion. Guzman claims that no one at the SBA made derogatory comments about Arab-Americans or

11

Muslims.  (Taleb Dep., ECF No. 17, PageID.557-.558)   The SBA asserts that Picarazzi and Gase deny they knew Taleb's national origin or religion.  (Picarazzi EEO Int., ECF No. 15, PageID.172-.174; Gase EEO Int., ECF No. 15, PageID.196-.197)

Taleb responds that even though she did not wear a hijab, she repeatedly identified herself as Muslim and Arab to her supervisor and co-workers.  She identified herself to Gase as a proud daughter of Muslim Lebanese immigrants. Taleb has met the first factor that she is a member of a protected class based on her religion as a Muslim and national origin as an Arab-American.

Guzman claims that there is no evidence that Gase and Picarazzi treated other colleagues better than they treated Taleb.  Guzman asserts that there is no evidence that Gase and Picarazzi included every other SBA employees in meeting or that other employees outside Taleb's protected class were included and introduced in every meeting.  Other employees outside of Taleb's protected class complained about Gase and also one employee complained about Picarazzi. Guzman asserts that Al-Badry, who is Iraqi and Muslim, testified that neither Gase nor Picarazzi treated her differently on the basis of her national origin or religion. Al-Badry admitted she was never asked about her religion or national origin.  She also testified that she did not hear any derogatory comments about Muslims or

Arab-Americans.  Al-Badry could not identify any harassment and only pointed to issues like lack of planning and support for the Road Show.  (Al-Badry Dep., ECF No. 15, PageID.155, .159-.160)

Taleb argues that Gase and Picarazzi did not engage in overtly anti-Arab or anti-Muslim statement is not dispositive.  Taleb claims that evidence that Gase and Picarazzi singled Taleb and Al-Badry out for ill-treatment creates a question of fact that their hostility and harassment was because they were Arab and Muslim.  Taleb asserts that Al-Badry's belief that she was not discriminated against is also not dispositive because Al-Badry testified that she could not speak to Taleb's experience.  Taleb claims that both Taleb and Al-Badry testified that they were subject to hostility and harassment by Gase.  Taleb testified that Gase's and Picarazzi's harassment and hostility were directed at her, and Al-Badry.  Gase and Picarazzi never treated non-Arab, non-Muslim colleagues the way they treated Taleb and Al-Badry.  (Taleb Dep., ECF No. 17, PageID.498, .529, .542) Al-Badry indicated that she and Taleb were the sole recipients of Gase's hostility and lack of communication.  (Al-Badry statement, ECF No. 17, PageID.892-.894)

The totality of the circumstances has shown that Taleb created a question of fact as to the second and third factors because she has testified that the hostility and lack of communication were only targeted at her and Al-Badry, another Muslim

and Arab-American.

As to the fourth factor, there remains genuine issues of material fact that the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment.  Taleb testified Gase's and Picarazzi's harassment interfered with her ability to do her job. They ignored her job-related requests for information, failed to introduce her during webinars, and Gase attempted to push her duties off onto her. (Taleb Dep., ECF No 17, PageID.472, .488-.489)   Al-Badry confirmed that Gase's "hostility and harassment" made it difficult for Al-Badry and Taleb to do their jobs.  (Al-Badry statement, ECF No. 17, PageID.892-.894)  Taleb and Al-Badry testified that they were particularly hamstrung by Gase's hostility during the Road Show. They claimed that while prepping for the Road Show, Gase repeatedly excluded Al-Badry and Taleb from planning meetings and withheld documents from Taleb. (Taleb Dep., ECF No. 17, PageID.503-.504) Taleb's and Al-Badry's testimonies create a question of fact that the hostility and harassment adversely affected their ability to do their jobs.

Regarding the fifth factor, Taleb created a question of fact in that she testified she complained to Logan about her treatment, yet the mistreatment continued.

Finding genuine issues of material facts, Guzman's Motion for Summary Judgment must be denied as to Taleb's hostile work environment claims in Counts I and II.

## C.   Employment Discrimination Based on National Origin and Religion (Counts I and II)

Guzman seeks summary judgment on Taleb's discrimination claims based on national origin and religion in that Taleb cannot establish a prima facie case. Taleb responds that she is able to meet the prima facie case.

Under the burden shifting approach developed for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972), a plaintiff must establish a *prima facie* case and create a presumption of discrimination by showing by a preponderance of the evidence:  (1) that he/she belongs to a protected class; (2) that he/she was subjected to an adverse employment action; (3) that he/she was qualified for the job; and (4) that he/she was treated differently from similarly situated employees from a non–protected class.  *McDonnell Douglas*, 411 U.S. at 802; *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995); and *Wilcoxon v. Minnesota Mining & Mfg. Co.*, 235 Mich. App. 347, 361 (1999). Alternatively, a plaintiff could establish a prima facie case by presenting credible, direct evidence of discriminatory intent.  *Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111 (6th Cir. 1987).

If a plaintiff proves a *prima facie* case, the burden of persuasion shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. Once the employer carries this burden, the burden then shifts back to plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination. *Id.*; *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991). The plaintiff may meet this burden by showing: 1) that the stated reasons had no basis in fact; 2) that the stated reasons were not the actual reasons; or 3) that the stated reasons were insufficient to explain the employer's action. *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991). The burden of persuasion always remains, however, with the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

An employee with whom a plaintiff seeks to compare must be similarly-situated in "all of the relevant respects." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998). The failure to identify a similarly situated employee who was treated more favorably than plaintiff is fatal to the plaintiff's claim under a disparate treatment theory. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir. 1992). The similarly situated employee must have the same

supervisor, be subject to the same standards and engaged in conduct of comparable seriousness to Plaintiff. *Id.*

Guzman argues that because Taleb's temporary position was not filled after she left, and she cannot identify any similarly situated temporary employee who had conduct similar to hers and not in her protected class who was not terminated. Taleb agrees that while permanent SBA employees and temporary employees may be subject to different disciplinary process, all employees are subject to the SBA's anti-harassment and equal employment policies. She asserts that Logan's refusal to even attempt to discipline, or even report, employees who were discriminatory and racist demonstrates a high tolerance for workplace misconduct from Caucasian employees. Taleb asserts that Caucasian employees were held to no standard at all.

Taleb identifies as comparators her alleged harassers, Gase and Picarazzi. She claims that Logan never even attempted to discipline them, despite Taleb's repeated complaints about Gase's and Picarazzi's harassment and hostility. Gase and Picarazzi are permanent employees. The Sixth Circuit has found that probationary employees do not stand on equal footing with permanent driver employees and cannot be similarly situated. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1270 (6th Cir. 1986). Probationary and permanent employees "face separate standards for removal." *White v. Ohio*, 2 F. App'x 453, 457 (6th

Cir. 2001).

Taleb also has not identified conduct similar to Taleb's conduct that the comparators engaged in and were not terminated. Guzman claims Taleb was terminated for failure to follow instructions after an incident with Picarazzi. Taleb ignored Logan's instructions to "table" her comments about the lead during a debrief call. Taleb also lacked diplomacy and tact in her communication style in several exchanges with her colleagues and Logan. Taleb identifies Gase's and Picarazzi's conduct as engaging in discriminatory and harassing acts but were not disciplined. The acts Taleb claims the Gase and Picarazzi's engaged conduct included failure to include Taleb in meetings, phone calls, emails, and trip planning. The conduct Gase and Picarazzi engaged in is not the same as the conduct Taleb engaged in–not following instructions–which resulted in her termination.

Taleb argues that in all relevant aspects of their employment, Taleb was similarly situated to Gase and Picarazzi who engaged in much worse conduct than she did, but were not disciplined, citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 348 (6th Cir. 2012). In *Chattman*, a race discrimination case, the comparators were white employees working in the plant floor. In this case, Taleb was a temporary employee, and the comparators, Gase and Picarazzi are permanent

employees who have been with the SBA for more than 10 and 30 years respectively. Taleb was hired as an outreach and marketing specialist. Gase was a senior area manager and Picarazzi was a lead economic development specialist. They were not similarly situated in all relevant aspects. Taleb cannot establish a prima facie case in that she is unable to show that Gase and Picarazzi were similarly situated as she was. Taleb has failed to show that she engaged in the same conduct as Gase and Picarazzi for which she was disciplined. The discrimination claims based on national origin and religion in Counts I and II must be dismissed.

### D.    Retaliation Claim (Count III)

Guzman asserts that Taleb fails to establish a prima facie case of retaliation. Taleb responds that genuine issues of fact remain as to her retaliation claim.

The elements of a *prima facie* case of under Title VII include: 1) that plaintiff engaged in an activity protected by Title VII; 2) that the defendant knew of this exercise of plaintiff's protected rights; 3) that defendant consequently took an employment action adverse to plaintiff; and 4) that there is a causal connection between the protected activity and the adverse employment action. *Balmer v. HCA, Inc.,* 423 F.3d 606, 613-14 (6th Cir. 2005); *Abbott v. Crown Motor Co., Inc.,* 348 F.3d 537, 542 (6th Cir. 2003).

Causation can be proven indirectly through circumstantial evidence such as suspicious timing. *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 523, 525 (6th Cir. 2008). Temporal proximity between an assertion of Title VII rights and a materially adverse action, is sufficient to establish the causal connection element of a retaliation claim where an adverse employment action occurs very close in time after an employer learns of a protected activity. *Id.* at 525. Where the nexus is not "very close," the Sixth Circuit has declined to find a causal connection based on timing alone. *Id.* at 523. In such a case, the plaintiff must proffer additional evidence of retaliatory conduct to establish a causal connection between the protected activity and the adverse employment action. *Little v. BP Exploration & Oil Co.,* 265 F.3d 357, 364 (6th Cir. 2001). A combination of evidence may include other employees' fear of retaliation, repeated comments regarding discipline, atmosphere where a plaintiff's activities were scrutinized more carefully than those of comparably situated employees, both black and white, more unwarranted criticism of plaintiff's work, and more frequent disciplinary writeups of plaintiff for trivial matters. *Id.*

In this case, Guzman argues that the other decision maker, Scott, who was Logan's boss, was unaware of Taleb's complaints of harassment to Logan. Scott had sought her termination as early as September 25, 2020 when he had a draft

document to support Taleb's termination.  (Email, ECF No. 15, PageID.336)  Scott based his reasons on his experience with Taleb at the Road Show and the complaints he received.  Guzman asserts that there is no support for Taleb's claim that Logan decided to terminate her because she complained of harassment. Guzman claims that Taleb had been complaining of harassment to Logan for months, yet Logan did not retaliate.  (Taleb Dep., ECF No. 17, PageID.482-.483, .532-.533) Even with her complaints, Logan had planned to hire Taleb as a permanent employee.    It was only until Taleb refused to follow Logan's instructions that she decided to terminate Taleb's employment.  (Email, ECF No. 15, PageID.262-.263) Guzman asserts that Taleb's opinion that Logan terminated her employment because she complained of harassment is insufficient to defeat summary judgment.  Taleb fails to submit any evidence to show retaliatory animus was the but-for cause of her termination.

Taleb responds that retaliatory animus does not require an adverse action was taken solely because of animus.  Taleb claims that Logan was motivated by retaliatory animus when terminating Taleb.   In the termination call, Logan indicated that Taleb had accused Logan of targeting her as a Muslim woman. Logan told Taleb that Logan did not deserve Taleb's accusations.  Taleb argues that Logan's own words that Taleb accused Logan of terminating Taleb because

Taleb was a Muslim woman creates a question of fact for the jury.

Guzman replies that the recording of Taleb's call with Logan does not prove retaliation.  Logan repeatedly stated that she terminated Taleb based on her substandard conduct, not her allegations of harassment or hostile environment.  In that call, when Taleb asked Logan what led to the decision to termination, Logan responded "your conduct."  (Tr., ECF No. 17, PageID.1066) Guzman asserts that there is no direct evidence in the recorded phone call that Logan terminated Taleb because of Taleb's complaints of harassment.

A review of the evidence submitted fails to establish any direct evidence by Logan that she terminated Taleb because of her complaints of harassment.  Logan specifically told Taleb that the termination was based on Taleb's conduct of not following directions, among other complaints to Logan and Scott.  Taleb has not shown that the cause of the termination was retaliatory animus for Taleb complaining about harassment.  The evidence shows that despite Taleb's complaints of harassment, Logan was planning to hire Taleb as a permanent employee.  Taleb has not met her burden for a prima facie case of retaliation in that she has not presented sufficient evidence as to a causal connection between the protected activity and the adverse employment action.  The retaliation claim must be dismissed.

### III.   CONCLUSION/ORDER

For the reasons set forth above,

IT IS ORDERED that Defendant's Motion for Summary Judgment **(ECF No. 15)** is GRANTED IN PART AND DENIED IN PART.   The Hostile Work Environment claims in Counts I and II REMAIN.   The Discrimination claims in Counts I and II are DISMISSED.    The Retaliation claim in Count III is DISMISSED.


s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

DATED:  October 10, 2024